Donai-iue, J.
It is contended, on the part of • the defendant in error, that the measure of damages in a case of this character is furnished by paragraph 6 of Section 8449, General Code, which reads as follows:
“The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events from the breach of warranty.”
The averments of the cross-petition of the de *81 fendant fairly brings this case within the terms of this paragraph of Section 8449, General Code, but there is no evidence in this record from which the jury could find that the defendant sustained any other or further damages than the difference between the value of the machinery at the time of the delivery to the defendant and its value if it had answered to the warranty.
The evidence offered on the part of the defendant shows that this mill was installed in July, 1910; that the plant was not put in operation until the early part of December of that year; that the quarry was not then in condition to .produce anything like the quantity of stone that could be handled through this mill, and that at times the defendant was compelled to stop the operation of the mill, until it could get enough rock to make 25, 35 or 40 tons. In that connection, Mr. Clark, the general superintendent of the plant of the defendant company, testified:
“No. Our quarry was small and we would quarry a day and let the plant lay until we could get up enough to make 25, 30 or 35 or 40 tons, you know. Then we would grind that up the next day. We didn’t have the quarry big enough to mine that as fast as we would use it.”
In April of the following year a steam shovel was added to the quarry equipment, and at that time five additional washers were added. According to the testimony of Mr. Clark, the mill then had a capacity of 140 tons per day, but this witness further testified that they were averaging only 40 *82 to 90 tons a day. When asked why they varied so much in tonnage produced, the witness answered :
“Probably the fault of the quarry.
“Q. How do you mean ? A. Not getting stone in for the mill.
“Q. Well then you say that is one of the reasons why the tonnage went low? A. Yes, sir.
“Q. That wouldn’t be on account of the machine then would it? A. No.
“Q. That would be because there wouldn’t be enough product? A. Yes, sir.
“Q. Are there any other reasons? A. None other.”
The record, however, does contain other testimony by this witness and other witnesses, that the mill, by reason of its inefficiency, did occasion delay in the operation of the plant, but even if that fact were conceded there was no evidence offered by which the jury might determine what part of the delay was occasioned by the inability to procure rock from the quarry and what part of the delay was occasioned by the mill, nor is there any evidence contained in the record that would furnish the jury any basis whatever to calculate the damages suffered by the defendant on account of such delay, or by reason of the increased cost of producing sand because of the defects in the mill. On the contrary, the evidence offered by the defendant shows that the plant was never operated to the full capacity of the mill, but that the daily output of sand varied from 40 to 90 tons. How a mill that has a daily capacity of 140 tons *83 delayed the operations of a plant producing from 40 to 90 tons a day, is not made apparent by the evidence, but it does appear that other causes at least contributed to, if they did not cause all, the delay, and this appearing from the evidence offered by the defendant, placed upon the defendant the burden of showing by some evidence what part of the total delay, if any, was occasioned by defects in the mill; and if it were the further claim of the defendant that, by reason of the defects in the mill, the cost of production of each ton of sand was increased, the defendant must furnish some evidence as to the amount of this increased cost of production, before the jury would be authorized to consider that as an element of damages.
The defendant in its answer avers that the mill was defective, but it appears from the evidence that this claim is based upon the defects in that part of the mill known as the washers.
On the 23d day of June of that year the defendant wrote the plaintiff as follows:
“We do not question the capacity of your chaser mill; the controversy is entirely with reference to your washers.”
About the time the steam shovel was placed in the quarry, some question did arise between the parties to this contract as to the capacity of this - mill. At that time plaintiff furnished a new set of washers, the cost of which is included in the account sued upon. It is the claim of the defendant that these washers were furnished under and as a part of the contract, and for the purpose of increasing the capacity of the mill, so that it would *84 answer to the warranty. This is denied by the plaintiff. This issue of fact was submitted to the jury, and the jury found for the plaintiff. It follows that these additional washers cannot now be considered by the court as furnished under the contract or covered by the contract of warranty in the original contract of sale.
The claim of the plaintiff is for damages for breach of warranty contained in the original contract of sale. By the finding of the jury, only part of these washers were included in that contract, and this record is absolutely barren of evidence to show which set of washers is complained of, or, if both are defective, what proportion of damages sustained by defendant, if any, was occasioned by the defect in washers covered by the contract or warranty, and what proportion, if any, was occasioned by the washers not included in the original contract and not covered by the warranty.
There is, therefore, a hopeless confusion in the evidence offered by the defendant, not only as to •the delays occasioned by the defect in the mill and the delays occasioned by the capacity of the quarry, but also in relation to the delays occasioned by the defects in the machinery furnished under the original contract and covered by the warranty, and the defects in the machinery furnished by the plaintiff to the defendant later, under a separate contract, and not covered by the warranty. Still more important is the fact that there is an entire absence of any evidence to establish the amount of damages, or any basis for the calculation of the amount of damages that the defendant suffered *85 by reason of the breach of warranty, other than the evidence offered as to the value of the mill at the time it was delivered to the buyer and the value it would then have had, had it answered to the warranty.
A verdict including other and further damages would necessarily have been based, as to amount, upon conjecture merely, and would not have been sustained by any evidence.
It is not the duty of a trial court to give in charge to the jury any abstract principles of law not applicable to the proofs in the case. On the-contrary, it would have been error for the court to do so. (The P., C. & St. L. Ry. Co. v. Fleming, 30 Ohio St., 480; Coal Company v. Estievenard, 53 Ohio St., 43.)
Aside from these considerations, however, it is not the privilege of the purchaser to retain defective machinery for an unlimited time, after the discovery of the defect, and recover, as damages for breach of warranty, the daily loss in the operation of the entire plant occasioned by the defect or insufficiency of this unit in the factory. If that were the law then an article of trifling value might delay the operation of large and- expensive machinery and increase the cost per unit of the articles manufactured in that factory for days, months and years, until the total damages arising therefrom would aggregate the value of the whole plant.
It was the duty of the purchaser, under the circumstances and conditions appearing from the evidence in this case, to act with reasonable promptness upon the discovery of the defect in the ma *86 chinery, to avoid, as much as possible, damage which the plaintiff would be responsible for on account of breach of warranty. Upon the discovery of the defect in this unit of the plant, and it appearing that this defect would cause daily losses in the operation of the entire plant, the defective mill should have v been removed from the plant, within a reasonable time, and another substituted in its place that would do its respective part in the operation of the whole factory. The purchaser would then be entitled to recover from the seller, as damages for breach of warranty, not only the increased cost of the mill and the additional cost of installing the same, but also any other loss directly and naturally resulting in the ordinary course of events, up to the time and until a proper mill was installed and put in operation, if that were done within a reasonable time; but on the contrary, if, notwithstanding the mill is defective, in that it will not produce the quantity of sand it was warranted to produce, the purchaser elects to retain the mill in place and use the same as a part of his factory, he will be limited in an action against the seller, in a breach of warranty, to a recoupment in diminution or extinction of the price paid therefor, under the provisions of division (a), paragraph (1) of Section 8449, General Code. The question, of course, as to whether the purchaser had elected to keep such defective mill, and the further question as to what would be a reasonable time that should be allowed to the purchaser to make such substitution, would ,both be questions for the jury, to be determined by *87 it under the peculiar circumstances of each particular case-.
The judgment of the court of appeals is reversed, and the judgment of common pleas court affirmed. Cause remanded to the common pleas court for execution.

Judgment of the court of appeals reversed, and that of the common pleas affirmed.

Nichols, C. J., Wanamaker, Newman, Jones and Matthias, JJ., concur.